## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

WILLIAM D. FOWLER,

      Plaintiff,

          v.

KENNETH W. STOLLE,
*individually and in his official capacity*
*as Sheriff of the City of Virginia Beach,*
*Virginia,*

      Defendant.

Case No. 2:22-cv-504

## MEMORANDUM OPINION & ORDER

Before the Court is Defendant Kenneth W. Stolle's Motion for Summary Judgment. ECF Nos. 37 (motion), 38 (memorandum). The Court has fully considered the arguments set forth in the parties' briefs and has determined it is not necessary to hold a hearing on the motion. For the reasons stated herein, the motion is **DENIED**.

## I.      BACKGROUND

The following facts are undisputed.[1]

1.      The defendant, Kenneth W. Stolle, was elected Sheriff of the City of Virginia Beach in November 2009, and was reelected in 2013, 2017, and 2021. ECF

---

[1] For the sake of brevity, the Court has only included facts here that are either (1) necessary to resolve the motion on the grounds discussed below in Part III, or (2) helpful to provide the reader with the facts of the case.

No. 38 (Defendant's Statement of Facts ("DSOF")) ¶ 1; ECF No. 47 (Plaintiff's Response to Defendant's Facts ("PRDF")) ¶ 1. The defendant ran as a Republican. *Id.*

2.      The plaintiff, William D. Fowler, was hired as a Deputy Sheriff in the Virginia Beach Sheriff's Office ("VBSO") by former Sheriff Paul Lanteigne in 2007. ECF No. 38 (DSOF) ¶ 2; ECF No. 47 (PRDF) ¶ 1. The plaintiff attended the Virginia Department of Criminal Justice Services ("DCJS") Basic Jailor Academy and received his DCJS certification in 2007. ECF No. 38 (DSOF) ¶ 9; ECF No. 47 (PRDF) ¶ 1.

3.      The defendant reappointed the plaintiff in 2010, 2013, and 2017. ECF No. 38 (DSOF) ¶ 3; ECF No. 47 (PRDF) ¶ 1.

4.      On November 30, 2021, the defendant informed the plaintiff that he would not be reappointed to an additional term starting in January 2022. ECF No. 38 (DSOF) ¶ 8; ECF No. 47 (PRDF) ¶ 4.

5.      In January 2015, the plaintiff was promoted to Sergeant, and in February 2016, he was assigned to Intake/Release. ECF No. 38 (DSOF) ¶ 4; ECF No. 47 (PRDF) ¶ 2, (Plaintiff's Statement of Facts ("PSOF")) ¶ 8.

6.      As an Intake/Release Sergeant, the plaintiff supervised other employees of the VBSO, including five deputies.[2] ECF No. 38 (DSOF) ¶¶ 12, 14; ECF No. 47 (PRDF) ¶¶ 5, 7. He was also responsible for "supervis[ing] the daily activities of

---

[2] Although the plaintiff asserts that he "disputes" the assertions in paragraphs 10 through 12, the plaintiff did not specifically dispute any of the facts asserted in these paragraphs except those that relate to the plaintiff's arrest powers. ECF No. 47 ¶ 5. As a result, facts relating to the plaintiff's arrest powers are disputed, and the Court considers the remaining facts undisputed. *See* Fed. R. Civ. P. 56(e)(2).

inmates, initial property inventory and general work assignments, conduct[ing] mandatory security checks, manag[ing] inmate behavior, and us[ing] force as necessary, and . . . enforcing institutional rules, regulations, and procedures." ECF No. 38 (DSOF) ¶ 12; ECF No. 47 (PRDF) ¶ 5. He also "performed administrative and related duties." ECF No. 38 (DSOF) ¶ 12; ECF No. 47 (PRDF) ¶ 5. In addition, the plaintiff interacted with outside entities including "other law enforcement agencies, arresting officers, magistrates, [and] medical staff."[3] ECF No. 38 (DSOF) ¶ 13; ECF No. 47 (PRDF) ¶ 6.

7.     The plaintiff had arrest powers, although the parties dispute the extent of those powers. ECF No. 38 (DSOF) ¶ 10; ECF No. 47 (PRDF) ¶ 5.

8.     In January 2010, Sheriff Stolle entered into a Memorandum of Understanding ("MOU") with the Virginia Beach Police Department ("VBPD"), on behalf of the City of Virginia Beach, whereby the VBPD utilizes VBSO deputies to assist with staffing, management, and operation of the VBPD Second Police Precinct's Temporary Detention Facility. ECF No. 38 (DSOF) ¶ 15; ECF No. 47 (PRDF) ¶ 1. The MOU remained in place during plaintiff's tenure. *Id.*

9.     On March 22, 2011, the plaintiff requested to work extra duty pursuant to the MOU. ECF No. 38 (DSOF) ¶ 17; ECF No. 47 (PRDF) ¶ 1. His request was

---

[3] The plaintiff "disputes" the assertions in paragraph 13, but only states that he "infrequently interacted with members of the general public." *See* ECF No. 47 ¶ 6. Accordingly, only the extent to which the plaintiff interacted with members of the public in his former role is disputed.

approved, and that approval remained in place through the remainder of his tenure. *Id.*

10.     The plaintiff was a Democrat, a member of the Democratic Party of Virginia Beach since 2017, and "voiced support for [the] Democratic Party Platform since before he began his career with the VBSO in 2007."[4] ECF No. 47 (PSOF) ¶ 1.

11.     The plaintiff is married to Kelly Convirs-Fowler, a member of the Virginia House of Delegates and a Democrat. *Id.* ¶ 2. Delegate Convirs-Fowler first ran as a candidate in 2017, won reelection in 2019 and 2021, and is running for reelection again in 2023. *Id.* The plaintiff's political views and beliefs, which he held before her election, "were given substantially more attention by VBSO command staff and others due to his known association with his wife." *Id.* ¶ 3.

12.     Before Delegate Convirs-Fowler ran for office in 2017, the plaintiff "never had a problem with career progression, promotions, or transfer opportunities." ECF No. 47 (PSOF) ¶ 4. The plaintiff has "consistently received positive or excellent evaluations" and "has never received a negative evaluation throughout his career." *Id.* ¶ 9.

13.     The plaintiff was promoted to corporal in 2010 and was asked to join the Intel Division. ECF No. 47 (PSOF) ¶¶ 5–6. The plaintiff "began competing for Sergeant once he was eligible in 2012 and immediately achieved a top-10 score (out

---

[4] Under the heading "Response to Plaintiff's 'Additional Material Facts,'" the defendant did not respond to paragraphs 1–9, 17–18, 20–24, and 31 in the Plaintiff's Statement of Facts. *See* ECF No. 49 § I. The Court takes this to mean that the defendant does not dispute these facts. *See* Fed. R. Civ. P. 56(e)(2).

of more than approximately 50 candidates),” and “[o]nce there were sergeant openings, Plaintiff was quickly promoted to sergeant in January 2015 after less than eight years on the VBSO.” *Id.* ¶ 7. The plaintiff was initially assigned to Corrections until February 2016, when he was assigned to Intake/Release. *Id.* ¶ 8. He remained with Intake/Release until the end of his employment with VBSO. *Id.*

14.    At the VBSO, “it is a common everyday occurrence for employees to talk about politics.”[5] ECF No. 47 (PSOF) ¶ 10; ECF No. 49 (Defendant’s Response to Plaintiff’s Facts (“DRPF”)) ¶ 10. But “[s]uch talk is normally from a Republican perspective to match the Sheriff’s preferences.” *Id.*

15.    The plaintiff spoke to the VBSO command staff about his wife’s candidacy on at least two occasions. ECF No. 47 (PSOF) ¶ 11; ECF No. 49 (DRPF) ¶ 11.

16.    In March or April 2017, the plaintiff had a conversation with Undersheriff Struzzieri regarding Delegate Convirs-Fowler’s candidacy. ECF No. 47 ¶ 12; ECF No. 49 ¶ 12. The plaintiff stated “Isn’t that great? It could be really helpful to have a House of Delegates member who is the spouse of a law enforcement officer.”

---

[5] The defendant “disputes the materiality” of various facts asserted by the plaintiff but does not appear to dispute the facts themselves. *See* ECF No. 49 ¶¶ 10–13, 15, 16, 25. Because the defendant does not dispute these statements as a factual matter, the Court finds that they are undisputed. Whether facts are material “is a question that requires the moving party to defer to substantive law, and ‘only disputes over facts that might affect the outcome of the suit under the governing law properly preclude the entry of summary judgment.’” *United States v. Mackey*, No. 12-80585, 2012 WL 12874194, at *1 (S.D. Fla. Nov. 13, 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (alteration accepted). Thus, materiality is a question for the Court to decide at the summary judgment stage.

*Id.* In reply, Undersheriff Struzzieri said "something to the effect of" "Well not really. We can't support her because she's not Republican." *Id.*

17.     The plaintiff asked for permission to circulate a petition in the VBSO "for his wife to be qualified to get on the ballot." ECF No. 47 (PSOF) ¶ 13; ECF No. 49 (DRPF) ¶ 13. This was "[c]onsistent with what other candidates are allowed to do in the VBSO." *Id.* The plaintiff's request was denied by "the Sheriff's command staff" because Delegate Convirs-Fowler "was not a Republican." *Id.*

18.     In October 2019, the plaintiff appeared in a political television commercial for Delegate Convirs-Fowler in his VBSO uniform.[6] ECF No. 38 (DSOF) ¶ 21. ECF No. 47 (PRDF) ¶ 11. The plaintiff did not request permission to appear in this advertisement in uniform as required by VBSO policy. *Id.* The plaintiff's failure

---

[6] The plaintiff asserts that he disputes the defendant's facts contained in paragraphs 21–22, 25, and 27. ECF No. 47 ¶ 11. But the plaintiff does not cite opposing evidence or indicate which specific facts he disagrees with; instead, the plaintiff's citation states "(See section below for Plaintiff's assertions of these events in detail)." *Id.* Federal Rule of Civil Procedure 56(c)(1) provides that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by: (A) citing to *particular parts of materials in the record* . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1) (emphasis added). Paragraph 11 of the plaintiff's response to the defendant's facts violates this rule. Citing the plaintiff's own statement of facts *might* have been excusable if the plaintiff had at least cited individual paragraphs for each fact—but the plaintiff did not do so, and instead cited to the entire "section below." The plaintiff did not do the work of responding fact-by-fact to the defendant's assertions, and the Court will not step in to pinch-hit for plaintiff's counsel. *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) ("The responsibility to comb through the record in search of facts relevant to summary judgment falls on the parties—not the court."); *Cray Commc'ns, Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 396 (4th Cir. 1994) ("Even assuming arguendo that the district court had some duty to consider the affidavit and exhibits, it would have remained well within its discretion in refusing to ferret out the facts that counsel had not bothered to excavate."). The Court accepts the defendant's statements in paragraphs 21–22, 25, and 27 as true. Fed. R. Civ. P. 56(e)(2).

to request permission was investigated, and he was advised to adhere to the VBSO's policy regarding public appearances in the future. *Id.*

19.    In September 2021, the plaintiff requested from the defendant, through his command staff, permission to appear in a political advertisement in support of Delegate Convirs-Fowler while wearing his VBSO uniform. ECF No. 38 (DSOF) ¶ 22; ECF No. 47 (PRDF) ¶ 11; ECF No. 47 (PSOF) ¶ 14(b); ECF No. 49 (DRPF) ¶ 14. The plaintiff's request was denied. *Id.* At the same time, the plaintiff requested permission to appear in uniform on a panel discussing a potential law to ban "unwanted/unsolicited sexual image texts." ECF No. 38 (DSOF) ¶ 22; ECF No. 47 (PRDF) ¶ 11.

20.    The defendant denied the plaintiff's request to appear on the panel because the plaintiff "had no expertise in . . . sexual abuse" and the defendant did not want him to speak for the law enforcement community without that knowledge.[7] ECF No. 38 (DSOF) ¶ 24 (quoting ECF No. 38-3 (Stolle Dep. Tr.) at 13:2–20); ECF No. 47 (PRDF) ¶ 12. The defendant also denied the plaintiff's request to appear in uniform in his wife's commercial because the plaintiff "'had been told once not to do it, and we

---

[7] The plaintiff "admits only" that the facts stated in paragraphs 24 and 26 of the Defendant's Statement of Facts "were Sheriff Stolle's statements at deposition, and does not admit the truth of those statements." ECF No. 47 (PRDF) ¶ 12. The plaintiff cites no evidence in support of its denial of "the truth of those statements." This is not an answer to a complaint; whether the plaintiff "admit[s]" the statements in these paragraphs is irrelevant. When the defendant makes a factual statement supported by evidence, the plaintiff is obligated to come forward with opposing evidence to show that a dispute exists. *See* Fed. R. Civ. P. 56(c). The plaintiff failed to do that here, so the Court accepts the facts in paragraphs 24 and 26 as true for the purposes of deciding this motion.

were not going to change our position on that at all.'" ECF No. 38 (DSOF) ¶ 25 (quoting ECF No. 38-3 (Stolle Dep. Tr.) at 13:2–20); ECF No. 47 (PRDF) ¶ 11.

21.    The defendant's "mission is to provide public safety for the citizens of Virginia Beach" and believes that if someone is "wearing my uniform . . . it's suggesting that I endorse that person." ECF No. 38 (DSOF) ¶ 26 (quoting ECF No. 38-3 (Stolle Dep. Tr.) at 20: 14–21:2); ECF No. 47 (PRDF) ¶ 12. The defendant has permitted deputies to appear in and out of uniform in advertisements for both Republican and Democratic candidates who "were pro law enforcement and supported the goals that I had set up at the sheriff's office." ECF No. 38 (DSOF) ¶ 26 (quoting ECF No. 38-3 (Stolle Dep. Tr.) at 21:3–9); ECF No. 47 (PRDF) ¶ 12.

22.    Although the plaintiff "'asked for permission to do an advertisement, and [the VBSO] denied that permission,'" the plaintiff was pictured in uniform in an online advertisement for Delegate Convirs-Fowler. ECF No. 38 (DSOF) ¶ 27 (quoting ECF No. 38-3 (Stolle Dep. Tr.) at 15:12–15); ECF No. 47 (PRDF) ¶ 11. The plaintiff admitted at his deposition that a picture that appeared in Delegate Convirs-Fowler's advertisement was "of him in his VBSO uniform."[8] ECF No. 38 (DSOF) ¶ 28 (citing

---

[8] The plaintiff "disputes" the statements in paragraph 28 and purports to provide a competing version of the facts in his brief. *See* ECF No. 47 (PRDF) ¶ 13. But the plaintiff cites no evidence to support his version of the facts. *Id.* A statement in a brief that is unsupported and unsworn will not defeat a competing statement that is supported by evidence. *See Johnson v. Samuel*, No. 4:20-cv-01059, 2021 WL 3417974, at *3 (D.S.C. Aug. 5, 2021) ("Plaintiff's unsworn argument in his objections is insufficient to rebut Defendant Samuel's sworn statement at the summary judgment stage."). The Court accepts the statements in paragraph 28 as true. Fed. R. Civ. P. 56(e)(2).

ECF No. 38-2 (Fowler Dep. Tr.) at 52:5–7 and ECF No. 38-15 (Campaign Advertisement)); ECF No. 47 (PRDF) ¶ 13.

23.     When the plaintiff was employed by the VBSO, "employees would approach Plaintiff to ask about his wife's positions on various issues and he would respond." ECF No. 47 (PSOF) ¶ 15; ECF No. 49 (DRPF) ¶ 15. The plaintiff also made statements "in support of Del. Convirs-Fowler, her accomplishments, and their shared policy positions, on his Facebook page" and appeared in advertisements for Delegate Convirs-Fowler "on multiple occasions over the course of multiple elections" and at political events. ECF No. 47 (PSOF) ¶ 16; ECF No. 49 (DRPF) ¶ 16.

24.     The defendant and his command staff knew that the plaintiff "believed and spoke about political issues from a Democratic perspective, which was in the minority at the largely-Republican VBSO." ECF No. 47 (PSOF) ¶ 17. In addition, the defendant believed—before the plaintiff was terminated—that the plaintiff's "political conversations were about [the plaintiff's] and his wife's actions, policy positions, and political views," which were "at odds with the majority of those in the office." *Id.* ¶ 18.

25.     The defendant believes that "diversity is a good idea in politics" but does not "think it's a good idea in my sheriff's office" because "we have to be one moving forward." ECF No. 47 (PSOF) ¶ 20.[9] The defendant "doesn't reappoint people who

---

[9] The Court notes that the deposition transcript of the defendant filed by the plaintiff, ECF No. 47-4, does not include the pages cited in ECF No. 47 ¶ 20. Nonetheless, because the defendant did not dispute the fact as stated in the plaintiff's brief, the Court accepts the fact as true. Fed. R. Civ. P. 56(e)(2). The Court appreciates the

don't share common vision for how law enforcement should be in Virginia Beach," and the defendant's "common vision" means "Republican political beliefs." *Id.* ¶¶ 21–22 (quoting ECF No. 47-4 (Stolle Dep. Tr.) 64:5–7 and ECF No. 38-1 (Fowler Aff.)).

26.     The defendant testified that "the law enforcement community is a very Republican organization," and that the plaintiff "should have known that there would be a problem when he [spoke about politics], and he just disregarded it." ECF No. 47 (PSOF) ¶ 23 (quoting ECF No. 47-4 (Stolle Dep. Tr.) at 105:16–06:5).

27.     The defendant does not have a written policy forbidding political conversations at work but has stated that supervisors should not speak about politics if it will make others feel uncomfortable. ECF No. 47 (PSOF) ¶ 24. "Because the VBSO is disproportionately Republican, in practice this means that VBSO employees may speak pro-Republican content but not pro-Democrats content." *Id.* ¶ 25.

28.     The defendant exhibited "hostility" to Delegate Convirs-Fowler and to the plaintiff "by assuming that it was Del. [Convirs-]Fowler who 'pestered' a reporter to contact the [defendant] and bring negative attention to the [defendant]." ECF No. 47 (PSOF) ¶ 31.

29.     Delegate Convirs-Fowler texted the defendant "to alert him to a potential political matter regarding one of his deputies involved in the January 6 Capitol protest." ECF No. 47 (PSOF) ¶¶ 33. "After communicating via text and

---

plaintiff's effort to reduce the number of pages in his filings but asks that he take extra care in the future when excerpting exhibits.

voicemail, the [defendant] called the Plaintiff into his office and terminated his appointment the day after the last voicemail in the exchange." *Id.*

The plaintiff filed suit against the defendant on December 6, 2022. ECF No. 1. The complaint asserts six claims under the First and Fourteenth Amendments of the U.S. Constitution and Article 1, Section 12 of the Virginia Constitution. *See id.* at 15–21. The plaintiff voluntarily dismissed the sixth count of the complaint on February 15, 2023. ECF No. 13. The plaintiff filed an amended complaint on March 2, 2023. ECF No. 18. This matter was reassigned to this Court on March 16, 2023. A jury trial is scheduled to begin on October 18, 2023.

## II.       LEGAL STANDARDS

### A.       Motions for Summary Judgment

"The party seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact." *Sedar v. Reston Town Ctr. Prop.*, LLC, 988 F.3d 756, 761 (4th Cir. 2021). "A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law." *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[C]onclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion." *Id.* "[A]ll justifiable inferences are to be drawn in [the nonmovant's] favor." *Liberty Lobby*, 477 U.S. at 255.

### B.      First Amendment Claims Alleging Wrongful Termination

#### i. *Speech Claims*

"The First Amendment protects public employees from termination of their employment in retaliation for their exercise of speech on matters of public concern." *McVey v. Stacy*, 157 F.3d 271, 277 (4th Cir. 1998). "[T]o determine whether a public employee has stated a claim under the First Amendment for retaliatory discharge, [the court] must determine (1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's speech was a substantial factor in the employee's termination decision." *Id.* at 277–78.

#### ii. *Political Association and Patronage Claims*

"Generally, the First Amendment's right to freedom of political association prohibits government officials from terminating public employees solely for supporting political opponents. However, under the *Elrod-Branti* exception, certain public employees can be terminated for political association in order to give effect to the democratic process." *McCaffrey v. Chapman*, 921 F.3d 159, 164 (4th Cir. 2019) (citing *Branti v. Finkel*, 445 U.S. 507 (1980) and *Elrod v. Burns*, 427 U.S. 347 (1976)).

To determine whether the *Elrod-Branti* exception applies, courts in the Fourth Circuit apply a two-part test. First, the court must determine "whether the position at issue, no matter how policy-influencing or confidential it may be, relates to partisan political interests or concerns." *Jimenez Fuentes v. Torres Gaztambide*, 807

12

F.2d 236, 241 (1st Cir. 1986) (*en banc*) (quotation marks omitted, alterations accepted); *Stott v. Haworth*, 916 F.2d 134, 141 (4th Cir. 1990) (adopting two-step test from *Jimenez Fuentes*)). "That is, does the position involve government decisionmaking on issues where there is room for political disagreement on goals or their implementation? Otherwise stated, do party goals or programs affect the direction, pace, or quality of governance?" *Jimenez Fuentes*, 807 F.2d at 241–42. Second, the court must "examine the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement." *Id.* at 242. This second inquiry focuses on "the powers inherent in a given office," not "the functions performed by a particular occupant of that office." *Id.*

### C.    Qualified Immunity

"A government official who is sued in his individual capacity may invoke qualified immunity." *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013), *as amended* (Sept. 23, 2013). "Qualified immunity protects government officials from civil damages in a § 1983 action insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Edwards v. City of Goldsboro*, 178 F.3d 231, 250 (4th Cir. 1999) (quotation marks omitted). "In determining whether a defendant is entitled to qualified immunity, a court must decide (1) whether the defendant has violated a

constitutional right of the plaintiff and (2) whether that right was clearly established at the time of the alleged misconduct." *Bland*, 730 F.3d at 391.

## III.    ANALYSIS

The plaintiff asserts essentially two claims: a First Amendment freedom of speech claim and a First Amendment freedom of association claim.[10] The defendant makes three arguments in his motion for summary judgment. First, with respect to the plaintiff's speech claim, the defendant argues that he is entitled to summary judgment on the merits. Second, the defendant argues that the *Elrod-Branti* exception applies and bars both of the plaintiff's claims.[11] Third, again with respect to both claims, the defendant argues that he is entitled to qualified immunity on the basis that, *inter alia*, a reasonable sheriff could have concluded that the plaintiff fell within the *Elrod-Branti* exception.[12]

---

[10] Each of these claims encompasses multiple counts of the complaint. *Infra* n. 14, 19.

[11] The Fourth Circuit has indicated that the *Elrod-Branti* exception can apply to speech claims as well as association claims. *Infra* n. 25.

[12] Although questions of qualified immunity are normally resolved before reaching the merits, the Court's *Elrod-Branti* analysis necessarily feeds into the Court's analysis of qualified immunity in this case. As a result, for clarity, the Court will discuss the merits first before proceeding to qualified immunity. *See Jafary v. City of Beckley*, No. 5:20-cv-647, 2021 WL 6125831, at *3 n.2 (S.D.W. Va. Dec. 28, 2021) (noting that "the merits and the first prong of qualified immunity are necessarily related" and addressing the merits first "for clarity").

### A.      Speech Claim

The defendant's motion with respect to the plaintiff's speech claim[13] is denied because the defendant has failed to demonstrate that he is entitled to summary judgment.

To make out a speech claim, the plaintiff must show "(1) . . . the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) . . . the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) . . . the employee's speech was a substantial factor in the employee's termination decision." *McVey*, 157 F.3d at 277–78.

As an initial matter, the defendant's analysis of the three *McVey* factors in his motion lacks clarity. With respect to the first factor—whether the plaintiff spoke as a citizen or as an employee—the defendant focuses exclusively on a narrow set of statements that the plaintiff made to the defendant regarding Delegate Convirs-Fowler's election to the Virginia House of Delegates, ECF No. 38 at 17–18, and on statements made by the Delegate Convirs-Fowler herself, which the defendant

---

[13] The plaintiff has also brought a speech claim under Article 1, Section 12 of the Virginia Constitution. *See* ECF No. 18 at 20. However, as the defendant points out, the Supreme Court of Virginia has stated that "Article I, § 12 of the Constitution of Virginia is coextensive with the free speech provisions of the federal First Amendment." *Elliott v. Commonwealth*, 593 S.E.2d 263, 269 (Va. 2004). As a result, the Court treats these claims together.

argues the "plaintiff piggybacks on" in the complaint.[14] *Id.* But then, with respect to the second *McVey* factor—balancing interests—the defendant focuses exclusively on speech that the plaintiff made to his subordinates and the plaintiff's appearances in Delegate Convirs-Fowler's political advertisements. *Id.* at 19. Finally, with respect to the third *McVey* factor—causal nexus—the defendant returns his focus to conversations that the plaintiff had with the defendant but asserts that "plaintiff cannot identify any conversations he had with Sheriff Stolle regarding his political views and relies only on the fact that they supported opposing political parties."[15] *Id.* at 20.

---

[14] Whether one may "piggyback" on another's speech to support a First Amendment speech claim is an issue that has divided courts. *See, e.g.*, *Falco v. Zimmer*, 767 F. App'x 288, 307 (3d Cir. 2019) ("[O]ne cannot claim First Amendment protection for the speech of another."); *Wesley v. S. Bend Cmty. Sch. Corp.*, No. 3:19cv32, 2019 WL 5579159, at *4 (N.D. Ind. Oct. 29, 2019) (analyzing various district court precedents from the Seventh Circuit and concluding that third parties cannot bring First Amendment retaliation claims based upon the speech of others); *Freeman v. Cnty. of Riverside*, No. 5:18cv2171, 2019 WL 7905733, at *6 (C.D. Cal. Apr. 5, 2019) ("[R]etaliation based on speech of a close family member is a right protected by the First Amendment in the Ninth Circuit."). The Court need not weigh in on this question to resolve the present motion because factual disputes with respect to the other statements made by the plaintiff preclude summary judgment.

[15] The defendant's argument that the "plaintiff cannot identify any conversations he had with Sheriff Stolle regarding his political views and relies only on the fact that they supported opposing political parties" lacks legal significance. ECF No. 38 at 20. Speech does not need to express "political views" in order to qualify for First Amendment protection. Speech that displays "political disloyalty"—e.g., speech that indicates the speaker's political association—is also protected. *Borzilleri v. Mosby*, 189 F. Supp. 3d 551, 562 (D. Md. 2016), *aff'd*, 874 F.3d 187 (4th Cir. 2017) (finding that the plaintiff's speech that conveyed "political disloyalty" included, *inter alia*, hosting a campaign event, distributing leaflets, and placing a campaign sign in her yard for the defendant's opponent); *Bland*, 730 F.3d at 394 (noting that the *Elrod-Branti* exception applies to association claims under the First Amendment *and* to

The plaintiff's opposition brief identifies several statements that he alleges form the basis of his speech claim. For example, the plaintiff points to the defendant's deposition testimony, which indicates that the defendant was aware that the plaintiff was having political conversations with other employees at the VBSO. ECF No. 47-4 at 113:4–15; *see also* Part I ¶ 24. Indeed, the defendant testified that one of the reasons he terminated the plaintiff was that he was "talking about politics" with his subordinates, which made them "feel uncomfortable." *Id.* at 104:4–106:5. The defendant further testified that "the law enforcement community is a very Republican organization . . . so [the plaintiff] should have known that there would be a problem when he did this, and he just disregarded it." *Id.* The plaintiff also states that he "spoke in the presence of the Sheriff regarding his own political views and in support of his wife's candidates and positions [sic: on] at least three occasions." ECF No. 47 (PSOF) ¶ 14. The defendant disputes this fact, claiming that "Sheriff Stolle had one conversation with the plaintiff about his wife, after her first election." ECF No. 49 (DRPF) ¶ 14. Finally, the plaintiff's brief references speech he made "outside of the workplace . . . on social media." ECF No. 47 at 18; *see also* Part I ¶ 23.

The problems presented by the defendant's incomplete analysis in his opening brief are exacerbated by his reply brief. The defendant's reply brief totally ignores the

---

speech claims based on speech "displaying . . . political disloyalty"). Thus, statements made by the plaintiff that reflect his association with the Democratic Party—even if they do not express particular "political views"—can form the basis of a cognizable speech claim. In any event, whether the plaintiff had conversations regarding his political views in the presence of the defendant is a disputed fact. ECF No. 47 (PSOF) ¶ 14.

*McVey* factors and the merits of the plaintiff's speech claim. *See* ECF No. 49. The defendant's reply focuses instead on qualified immunity and the *Elrod-Branti* exception. *Id.* Viewing these problems together, it is clear that the defendant has failed to show that he is entitled to summary judgment on the plaintiff's speech claim.

Because the content and context of speech can be determinative of whether a plaintiff was speaking as a citizen or as an employee, the first *McVey* factor must be analyzed with respect to each statement or kind of statement. *See Connick v. Myers*, 461 U.S. 138, 147 (1983) ("Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."). The same logic applies to the second *McVey* factor as well—"whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public" will surely depend on the content and context of the employee's speech.

By failing to address each statement or type of statement asserted by the plaintiff, the defendant has failed to show that he is entitled to summary judgment on the plaintiff's speech claim, and no analysis of the *McVey* factors is required. *Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 299 (4th Cir. 2012) ("[W]here the movant fails to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, even if no opposing evidentiary matter is presented, for the non-movant is not required to rebut an insufficient showing.").

18

Nonetheless, even if the defendant had comprehensively addressed the plaintiff's speech claim, the record shows that the claim survives summary judgment. The first *McVey* factor looks to whether the plaintiff was speaking as a private citizen on a matter of public concern. For speech to be made as a private citizen, it must not be made pursuant to one's "official responsibilities." *Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006). But "it is well established that an employee can speak as a private citizen in his workplace, even if the content of the speech is 'related to the speaker's job.'" *Bland*, 730 F.3d at 387 (quoting *Garcetti*, 547 U.S. at 421). For this reason, the defendant's argument that "the only speech in which plaintiff engaged related to his position as an employee" fails to carry the day. ECF No. 38 at 17.

The defendant has not shown that any of the plaintiff's speech—his conversation(s) with the defendant and other superiors at the VBSO, his conversations with his subordinates, his statements on social media, and his appearances in political advertisements for Delegate Convirs-Fowler[16]—was made pursuant to his "official responsibilities." *Garcetti*, 547 U.S. at 424. Thus, the defendant has failed to show that the plaintiff did not speak as a private citizen.

---

[16] *See* Part I ¶¶ 14–16, 23–24. As the Court previously noted, the parties dispute the content and number of conversations that the plaintiff and the defendant had regarding politics. As a result, all of the aforementioned undisputed speech forms a plausible basis for the plaintiff's speech claim, and the disputed speech (additional conversations that the plaintiff might have had with the defendant and the content of those conversations) presents a material dispute that precludes summary judgment.

The defendant has also failed to show that the plaintiff did not speak on a matter of public concern. The defendant concedes that "[a]n election is a matter of public concern," ECF No. 38 at 17, and most of the plaintiff's speech was about his wife's candidacy in an election for the Virginia House of Delegates. *See, e.g.*, Part I ¶¶ 15 (the plaintiff spoke to VBSO "command staff" about Delegate Convirs-Fowler's candidacy on at least two occasions), 16 (the plaintiff spoke to Undersheriff Struzzieri about Delegate Convirs-Fowler's candidacy in March or April of 2017), 17 (the plaintiff requested to circulate a petition at the VBSO "for his wife to be qualified to get on the ballot"), 23 (the plaintiff spoke to other VBSO employees about Delegate Convirs-Fowler's candidacy, made social media posts about Delegate Convirs-Fowler's candidacy, and appeared in campaign ads); ECF No. 47 (PSOF) ¶ 14 (the plaintiff claims that he had "at least three" conversations "in the presence of" the defendant regarding his political views and Delegate Convirs-Fowler's candidacy); ECF No. 49 (DRPF) ¶ 14 (the defendant denies that the plaintiff spoke in his presence about his political views or Delegate Convirs-Fowler's candidacy, but admits that he had one conversation with the plaintiff "about his wife, after her first election.").

Moving to the second *McVey* factor—balancing interests—the Fourth Circuit's decision in *Bland* is instructive. The court found that the second *McVey* factor was met, observing that "political speech . . . is entitled to the highest level of protection." *Bland*, 730 F.3d at 387; *see also, e.g.*, *Republican Party of Minnesota v. White*, 536 U.S. 765, 774 (2002) (noting that speech about the qualifications of candidates for public office is "at the core of our First Amendment freedoms") (quotation marks

omitted). The court noted that "the public's interest in [the plaintiff's] opinions regarding the election may have had particular value to the public in light of his status as a Sheriff's Office employee." *Id.* The court also explained that "despite the Sheriff's reference to the need for harmony and discipline in the Sheriff's Office, nothing in the record in this case indicates that [the plaintiff's speech] did anything in particular to disrupt the office or would have made it more difficult for [the plaintiff], the Sheriff, or others to perform their work efficiently." *Id.*

*Bland*'s reasoning applies here. The plaintiff's speech was clearly political in nature, and to some degree it may have had "particular value to the public" in light of his employment status.[17] Although the defendant claims that the plaintiff was informed that his "practice of discussing politics" with others at the VBSO "ma[de] others uncomfortable," the plaintiff disputes this fact. ECF No. 38 ¶ 36; ECF No. 47 ¶ 20. In any event, on this record, this generalized claim is insufficient to show that the plaintiff's speech "made it more difficult" for individuals in the VBSO "to perform their work efficiently" such that the defendant's interest outweighed the plaintiff's interest in making speech which was "entitled to the highest level of protection." *Bland*, 730 F.3d at 387.

---

[17] For example, the defendant states that he "did not support plaintiff's wife because of her anti-law enforcement positions on numerous bills." ECF No. 38 ¶ 62. Speech from a deputy sheriff voicing support for a candidate who might be seen as "anti-law enforcement" could be of "particular value to the public," even if the deputy sheriff is the candidate's spouse.

The defendant also argues that the plaintiff's appearance in advertisements "without permission the first time, and in defiance of a direct order the second time . . . conflicted with his responsibility to abide by VBSO policies and its command structure." ECF No. 38 at 19. But the defendant points to no evidence to show that this "made it more difficult for [the plaintiff], the Sheriff, or others to perform their work efficiently." *Bland*, 730 F.3d at 387. Indeed, the defendant's evidence shows that the plaintiff was not punished for his first in-uniform appearance in a 2019 advertisement and was instead given "advice . . . to ensure he adhere[d] to policy relating to public appearance in the future." *Id.* With respect to his second in-uniform appearance in a 2021 advertisement, in which only a photo of the plaintiff was shown, the plaintiff testified in his deposition that he was "not sure" if the photo was featured in the advertisement, and that he "had nothing to do with this part of the commercial." ECF No. 38-2 at 52:2–20. Although a deputy deliberately disobeying a direct order could certainly support a finding that his speech was disruptive to the function of the office, there are disputes of fact here regarding the plaintiff's knowledge and intent that prevent the Court from making such a finding.

The defendant does not point to any evidence that the plaintiff's other speech—his conversation(s) with the defendant and other superiors at the VBSO or his statements on social media—caused any disruption to the efficient operation of the VBSO. Accordingly, the defendant has failed to show that he is entitled to summary judgment on the second *McVey* factor.

The third and final *McVey* factor asks whether "the employee's speech was a substantial factor in the employee's termination decision." *McVey*, 157 F.3d at 277–78. Here, the defendant testified in his deposition that the plaintiff "talking about politics at work" was "one of the reasons" the defendant considered when deciding "whether to keep him or not." ECF No. 47-4. at 38:9–25. For the purposes of this motion, the defendant has not disputed that "it is a common everyday occurrence for employees to talk about politics," but "[s]uch talk is normally from a Republican perspective to match the Sheriff's preferences." Part I ¶ 14. Nor does the defendant dispute that he and his command staff knew that the plaintiff "believed and spoke about political issues from a Democratic perspective, which was in the minority at the largely-Republican VBSO," and that the plaintiff's "political conversations were about [the plaintiff's] and his wife's actions, policy positions, and political views," which were "at odds with the majority of those in the office." Part I ¶ 24. Most significantly, the defendant claimed that he "doesn't reappoint people who don't share common vision for how law enforcement should be in Virginia Beach," and that his "common vision" means "Republican political beliefs." *Id.* ¶ 25; *see also* ¶ 26. These facts, when taken together with the other facts in the record, could allow a "reasonable jury" to find for the plaintiff. *S.B. ex rel. A.L. v. Bd. Of Educ. Of Harford Cnty.*, 819 F.3d 69, 74 (4th Cir. 2016).

For the foregoing reasons, the defendant has failed to show that he is entitled to summary judgment on the plaintiff's speech claim.

23

### B. Political Association Claim

The parties' briefing on the plaintiff's political association claim[18] focuses on whether the *Elrod-Branti* exception applies. Determining whether this exception applies requires examining the function and responsibilities of the plaintiff's former role. As explained further below, the defendant's motion with respect to the plaintiff's association claim is denied because there are disputes of material fact regarding the function and responsibilities of the plaintiff's former role as a deputy sheriff, and the facts that are undisputed at this point tend to favor the plaintiff.

### i. *The* Elrod-Branti *Exception*

In *Elrod v. Burns* and *Branti v. Finkel*, the Supreme Court recognized that public employees may be fired for political reasons if "the hiring authority can

---

[18] The complaint asserts three related association claims: Count I (Wrongful Dismissal and Abridgement of Freedom of Association (Intimate and Expressive) in Violation of the First and Fourteenth Amendments), Count III (Wrongful Dismissal and Abridgment of Freedom of Association (Intimate and Expressive) Rights of Article 1, Section 12 of the Virginia Constitution), and Count V (Wrongful Patronage Dismissal in Violation of the First and Fourteenth Amendments). With respect to Count III, as the Court noted above, the Supreme Court of Virginia has held that Article 1, Section 12 of the Virginia Constitution is coextensive with the free speech provisions of the First Amendment of the U.S. Constitution. *Supra* n. 13. Although it is unclear whether the same is true for the freedom of association provisions of the First Amendment of the U.S. Constitution, the Court concludes that Counts I and III are properly considered together because neither party has argued to the contrary. With respect to Count V, it is not clear to the Court whether there is any daylight between this count and Count I. A "patronage dismissal" *is* a dismissal on the grounds of political association. *See Elrod*, 427 U.S. at 355–368. Neither party has explained how these counts are distinct; indeed, both parties appear to treat them together in the briefing. *See, e.g.*, ECF No. 38 at 21 (defendant treating association and wrongful patronage claims together); ECF No. 47 at 23 (plaintiff not disputing defendant's treatment and making responsive arguments under heading "Plaintiff Prevails on his Association *Claims*") (emphasis added). Accordingly, the Court analyzes Counts I, III, and V together.

demonstrate that [political] party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518. This rule, known as the *Elrod-Branti* exception, carves out a narrow set of circumstances in which a public employee's "First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." *Id.* at 517.

The Fourth Circuit has applied the *Elrod-Branti* exception in a handful of cases, some of which deal with very similar circumstances to these: a sheriff firing a subordinate employee for (allegedly) political reasons. As discussed further below, these cases demonstrate that determining whether the *Elrod-Branti* exception applies is a fact-intensive inquiry. The Court must "engage in a *Stott*-type analysis" and "examin[e] the specific position at issue" to determine if it resembles that of "a policymaker, a communicator, or a privy to confidential information." *Jenkins*, 119 F.3d at 1164 (quotation marks omitted). If it does, then the exception applies, and the plaintiff may be fired for political reasons.

In *Jenkins*, a newly elected sheriff in North Carolina fired several deputy sheriffs. *Jenkins*, 119 F.3d at 1158. The former deputy sheriffs sued the sheriff, alleging that they were dismissed for failing to support the sheriff's election bid, for supporting the sheriff's opponent, and for failing to associate with the sheriff's campaign in violation of their First and Fourteenth Amendment rights. *Id.* The Fourth Circuit, sitting *en banc*, held that the *Elrod-Branti* exception applied and remanded to the district court with instructions to dismiss the case. *Id.* at 1164–65.

25

To determine whether the exception applied, the court looked to "the specific political and social roles of sheriffs and their deputies in North Carolina" and found that "[t]he North Carolina legislature has . . . recognized the special status of sheriffs' deputies in the eyes of the law." *Jenkins*, 119 F.3d at 1163–64. The court also observed that the Supreme Court of North Carolina found that deputy sheriffs "act[] in the name of and with powers coterminous with . . . the elected sheriff." *Id.* (quotation marks omitted). The court concluded that "the office of deputy sheriff is that of a policymaker, and that deputy sheriffs are the alter ego of the sheriff generally, for whose conduct he is liable." *Id.* at 1164.

The *Jenkins* court limited its holding "to those deputies actually sworn to engage in law enforcement activities on behalf of the sheriff." *Jenkins*, 119 F.3d at 1165. In addition, the court "caution[ed] sheriffs that courts examine the job duties of the position, and not merely the title, of those dismissed." *Id.*

The Fourth Circuit next addressed the *Elrod-Branti* exception in the context of North Carolina sheriffs and their deputies in *Knight v. Vernon*, 214 F.3d 544 (4th Cir. 2000). There, the plaintiff was a jailer who claimed she was fired by the sheriff for political disloyalty in violation of the First Amendment. *Id.* at 545. In considering whether the *Elrod-Branti* exception applied, the court first looked to *Jenkins*. *Id.* at 549. Observing that "[t]he central message of *Jenkins* is that the specific duties of the public employee's position govern whether political allegiance to her employer is an appropriate job requirement," the court found that the plaintiff's duties included, e.g., filling out paperwork when new inmates arrived, feeding inmates, distributing

26

medicine, checking on inmates, overseeing visitors, and transporting inmates to prisons or medical facilities. *Id.* at 549. The court concluded that "[t]he responsibilities of a jailer, such as [the plaintiff], are routine and limited in comparison to those of a deputy sheriff, who may be fired for his political affiliation." *Id.* at 550.

The court observed that, in contrast, a deputy sheriff "is a sworn law enforcement officer" and "has the general power of arrest." *Knight*, 214 F.3d at 550. Because the plaintiff "was not out in the county engaging in law enforcement activities on behalf of the sheriff," "was not a confidant of the sheriff," "did not advise [the sheriff] on policy matters," and was not "involved in communicating the sheriff's policies or positions to the public," the court concluded that "political allegiance to [the sheriff] was not an appropriate requirement for the performance of her job as a jailer." *Id.*

The dissent in *Knight* argued that the plaintiff's responsibilities as a jailer "essentially comport with those we found important in *Jenkins*." *Knight*, 214 F.3d at 554 (Widener, J., dissenting). Responding to the dissent, the majority noted that while "[i]t is true that a jailer must exercise some judgment and common sense in guarding and caring for inmates . . . a jailer does not exercise the 'significant discretion' that *Jenkins* found to be accorded to deputy sheriffs, who 'make some decisions that actually create policy.'" *Id.* at 551 (quoting *Jenkins*, 119 F.3d at 1162). In particular, "[the plaintiff] was not consulted about jail policy, and she did not make policy." *Id.* In addition, the majority noted that she was not a "communicator" simply

by virtue of her contact with visitors, nor was she the sheriff's "'second self' in the sense that a deputy is" with powers "coterminous" to those of the sheriff. *Id.* (quoting *Jenkins*, 119 F.3d at 1163).

In *Bland v. Roberts*, 730 F.3d 368 (4th Cir. 2013), three "sworn, uniformed sheriff's deputies" who had worked as jailers in the Hampton Sheriff's Office in Virginia brought suit against the sheriff, alleging that they were terminated for political disloyalty. *Id.* at 372. The deputies did not take the Virginia Department of Criminal Justice Services' "Basic Law Enforcement" course, nor did they have "general powers of immediate arrest." *Id.* Rather, the deputies were only empowered to make "incidental arrests in the range of their work." *Id.* (quotation marks omitted, alterations accepted).

The court looked to *Jenkins* and declined to read it as broadly holding that all sheriff's deputies may be fired for political reasons:

> That brings us to the question of how to read *Jenkins*. Despite a significant amount of language in the opinion seemingly indicating that all North Carolina deputies could be terminated for political reasons regardless of the specific duties of the particular deputy in question, and despite the dissent's allegation that the majority indeed held that all North Carolina deputies may be fired for political reasons, the majority explicitly stated that it analyzed the duties of the plaintiffs and not merely those of deputies generally. In the end, the majority explained that it was the deputies' role as sworn law enforcement officers that was dispositive and suggests that the result might have been different had the deputies' duties consisted of working as dispatchers. Accordingly, to be true to *Jenkins*, we too must consider whether requiring political loyalty was an appropriate requirement for the effective performance of the public employment of the deputies before us *in light of the duties of their particular positions*.

*Bland*, 730 F.3d at 377 (citations omitted, emphasis in original). Looking to the duties of the plaintiff deputies, the court found that they were "essentially identical to those of the plaintiff in *Knight v. Vernon*" because they included, *inter alia*, providing "protection of jail personnel and the public," providing "safekeeping and welfare of prisoners," conducting "security rounds," supervising inmates, providing supplies to inmates, escorting inmates, and answering inmate grievances. *Id.* at 377–78.

The court noted that the deputies were "entitled to stand in for their sheriff in one way that [the plaintiff in *Knight*] could not, namely, by making an arrest." *Bland*, 730 F.3d at 379. Although "[i]t is true that in Virginia sheriff's deputies are, like sheriffs, statutorily authorized to make arrests under a wide range of circumstances . . . [that] does not mean that exercising those powers was an appreciable part of the duties of their particular positions." *Id.* The court found that the deputies' ability to make arrests "for offenses occurring before them in the course of their everyday responsibilities . . . had no appreciable effect whatsoever on the job duties of their position." *Id.* (quotation marks omitted). None of the plaintiffs had ever made an arrest, and none were aware that they had the authority to do so. *Id.* The court concluded that "the Sheriff has not established that the jailers' arrest duties were sufficiently significant that they would affect whether their political allegiance to the Sheriff was an appropriate requirement for the effective performance of their jobs." *Id.*

Finally, in *McCaffrey v. Chapman*, 921 F.3d 159 (4th Cir. 2019), a deputy sheriff working in Loudon County, Virginia, was terminated by the sheriff after he

openly supported the sheriff's opponent in an election. *Id.* at 162. The court concluded that the *Elrod-Branti* exception applied. *Id.* at 168. The plaintiff was a "major crimes detective serving as a lead detective in complex, high-profile cases" involving "rape, robbery, and homicide." *Id.* at 162, 167. "Like the deputy sheriffs in *Jenkins* and unlike the deputies in *Bland* and *Knight*, McCaffrey engaged in law enforcement functions on behalf of the sheriff."[19] *Id.* 167. The court observed that the plaintiff had received awards and recognition for his accomplishments as a law enforcement officer. *Id.* The court explained that "[s]heriffs, by virtue of their executive roles, do not set policy in the same way as those performing legislative roles. But, in attempting to faithfully enforce the law, they must make policy-oriented decisions about the allocation of manpower and financial resources." *Id.* at 168.

The court also looked to Virginia law, which establishes, *inter alia*, that sheriffs may "appoint deputies to 'discharge any of the official duties of their principal during his continuance in office.'" *Id.* (quoting Va. Code § 15.2-1603). In addition, the court observed that "a sheriff in Virginia is civilly and criminally liable for the acts of his deputy." *Id.*

---

[19] The *McCaffrey* court incorrectly states that "the jailers in *Bland* did not have arrest power." *McCaffrey*, 921 F.3d at 166. The *Bland* court actually found that "all deputies [in Virginia] have been granted general arrest powers," and the specific deputies in that case were authorized to make arrests "for offenses occurring before them in the course of their everyday responsibilities." *Bland*, 730 F.3d at 379 (quotation marks omitted). It is true, however that the deputies in *Bland* did not have the "Basic Law Enforcement" credential that would have allowed them to exercise "general powers of immediate arrest." *Id.* at 372.

The Fourth Circuit's decisions in *Jenkins*, *Knight*, *Bland*, and *McCaffrey* illustrate that determining whether the *Elrod-Branti* exception applies can be a complex and fact-intensive endeavor. Indeed, it is notable that all of these cases were decided over fervent dissents. Nonetheless, when these cases are viewed together, the contours of the *Elrod-Branti* exception in cases involving deputy sheriffs are sufficiently clear: deputy sheriffs primarily engaged in traditional law enforcement activities fall within the exception, and deputy sheriffs primarily serving as jailers do not.

### ii.   Analyzing the **Elrod-Branti** *Exception in this Case*

Whether the plaintiff's role as a deputy sheriff was more like that of a jailer, as in *Knight* and *Bland*, or more like a traditional law enforcement officer, as in *McCaffrey*, is not entirely clear on the present record. To attempt to differentiate this case from *Knight* and *Bland*, the defendant primarily argues the plaintiff possessed and exercised arrest powers, served in a supervisory role over other deputies, and communicated with various third parties on behalf of the sheriff. As discussed further below, the facts that are undisputed at this point suggest that the plaintiff's role was closer to those in *Knight* and *Bland*. But there are several factual issues that must be resolved before the Court can make a final determination. For these reasons, the defendant has failed to show that he is entitled to summary judgment.[20]

---

[20] In cases involving sheriffs' offices, courts easily and briefly conclude that the first *Stott* step is satisfied and proceed directly to analyzing the second step. *See Bland*, 730 F.3d at 376 ("Certainly there is legitimate disagreement over the goals and implementation of the goals of a sheriff's office; accordingly, the outcome of the *Stott* test will turn on the outcome in *Stott*'s second step."). For completeness, the Court

> a.   *The plaintiff's basic job responsibilities appear to resemble those in* Bland, *but the factual record is disputed and insufficiently developed.*

The plaintiff was an Intake/Release Sergeant. The parties do not dispute that the plaintiff's job responsibilities included supervising other employees of the VBSO (including other deputies), supervising inmates, inventorying inmate property, conducting security checks, managing inmate behavior, enforcing institutional rules, and performing administrative duties. Part I ¶ 6. These responsibilities are similar to those of the deputies in *Bland*. *See* 730 F.3d at 377 (listing as responsibilities, among others, "provide protection of jail personnel and the public," "provide safekeeping and welfare of prisoners," "conduct security rounds," and "supervise inmate activities.") (alterations accepted, quotation marks omitted).

Even though the parties do not dispute several of the plaintiff's job responsibilities, it does appear that these agreed-upon responsibilities do not provide a fulsome picture of the plaintiff's role. The defendant included with his motion what purports to be a job description for the plaintiff's position, which provides an extensive description of the plaintiff's alleged responsibilities as an Intake/Release Sergeant. See ECF No. 38-8. The plaintiff disputes the applicability of the job description provided by the defendant—he claims in his affidavit that he had never seen this document before this litigation and that, because it is undated, he does not know if it was in effect when he was employed. ECF No. 47-1 at 5. In addition, the

---

concludes that the first step of the *Stott* test is satisfied in this case for the reasons articulated in *Bland*.

plaintiff states that the description includes "virtually all items that any sergeant or deputy would do occasionally, and is not limited to the tasks that an Intake/Release Sergeant would do on a regular basis." *Id.* The plaintiff's deposition transcript also raises several factual disputes about the responsibilities listed in this document. *See* ECF No. 38-2 at 76:4–114:19 (disputing whether certain responsibilities listed in the exhibit were actually performed by deputies in Intake/Release, the frequency with which certain activities were undertaken, and the extent to which the plaintiff had discretion in carrying out certain responsibilities).

As *Bland* makes clear, the frequency with which a particular power is exercised can impact the *Elrod-Branti* analysis. *See Brand*, 730 F.3d at 379 ("That all deputies have been granted general arrest powers by statute, however, does not mean that exercising those powers was an appreciable part of the duties of their particular positions."). And *Jenkins* and *Knight* both indicate that the amount of discretion entrusted to an employee can be an important factor in the *Elrod-Branti* analysis. *See Jenkins*, 119 F.3d at 1162 (noting that deputies exercise "significant discretion in performing their jobs"); *Knight*, 214 F.3d at 550 (noting that the deputy was "not entrusted with broad discretion."). Thus, there are disputes of material fact as to (1) what the responsibilities and activities of the plaintiff's role actually were, (2) whether undertaking those responsibilities and activities involved an exercise of "significant" or "broad" discretion, and (3) whether those responsibilities and activities were "an appreciable part" of the plaintiff's duties.

> b. *Factual disputes about the plaintiff's supervisory responsibilities and arrest powers preclude summary judgment.*

Although the undisputed facts of this case closely resemble those in *Bland*, two disputed facts stand out as potential differentiators: the plaintiff's supervisory responsibilities and arrest powers. As discussed below, the record regarding both of these potential differences is disputed and insufficiently developed such that summary judgment is precluded.

The parties agree that the plaintiff supervised other employees, but this factor is not dispositive. Although *Bland* also notes that the deputies in that case did not have "leadership responsibilities," *Bland*, 730 F.3d at 377, the Fourth Circuit has explained that "a supervisory employee does not automatically hold a position that is subject to the *Elrod–Branti* exception." *Lawson v. Union Cnty. Clerk of Ct.*, 828 F.3d 239, 249 (4th Cir. 2016), *as amended* (July 8, 2016). In another case, the Fourth Circuit came to a similar conclusion and reasoned that "[i]f having power over subordinates were a sufficient condition for exemption from the requirements of the First Amendment, only the most low-level government employees would be protected from politically-based hiring and firing." *Fields v. Prater*, 566 F.3d 381, 387 (4th Cir. 2009). This comports with the Supreme Court's decision in *Elrod*, which explains that supervisors "may have many responsibilities, but those responsibilities may have only limited and well-defined objectives," making "[t]he nature of the responsibilities critical." 427 U.S. at 367.

34

The record at this point shows that the plaintiff was separated from the sheriff by multiple levels of supervision: according to an organizational chart provided by the defendant, the Intake/Release unit was overseen by a Captain, who reports to a Chief Deputy, who reports to the Undersheriff, who presumably then reports to the Sheriff. *See* ECF No. 38-5. The plaintiff's deposition testimony also suggests that his immediate supervisor was a lieutenant, which would be an additional level of supervision not captured by the organizational chart. ECF No. 38-2 at 79:2–22. These layers of separation between the defendant and the plaintiff make it less likely that the plaintiff was "a confidant of the sheriff" or that the plaintiff "advise[d] him on policy matters," and make it more likely that the plaintiff "simply followed orders." *Knight*, 214 F.3d at 550–51. These facts raise material disputes about the nature of the plaintiff's supervisory role and the extent to which that affects the Court's *Elrod-Branti* analysis.

Unlike the deputies in *Bland*, the plaintiff here exercised his arrest power, but the parties dispute the extent to which he did so. The defendant argues that the plaintiff "made multiple arrests," ECF No. 38 at 3, and the defendant includes with his motion several Arrest Reports that list the plaintiff as the arresting officer, ECF No. 38-7. But the plaintiff argues that because the sheriff's office "is not the primary law enforcement agency in Virginia Beach, the practical reality is that . . . deputies do not make 'arrests' in the usual sense of the word," and that "[s]ometimes . . . deputies, including myself, would serve paperwork . . . on inmates already in the jail, which would be listed in the paperwork as an arrest." ECF No. 47-1 ¶ 34. The

plaintiff's argument is supported by the Arrest Reports provided by the defendant, which show that all but one occurred at the same address (i.e., the jail). *See* ECF No. 38-7.

If the plaintiff's job responsibilities included making arrests outside of the jail, that fact could tend to show that the plaintiff was "out in the county engaging in law enforcement activities on behalf of the sheriff." *Knight*, 214 F.3d at 550.  The parties agree that the plaintiff made one arrest outside of the jail: On July 2, 2011, the plaintiff made an arrest at 2399 Atlantic Avenue in Virginia Beach. ECF No. 38 (DSOF) ¶ 18; ECF No. 47 (PRDF) ¶ 9. Presumably, this was an example of the plaintiff performing additional work pursuant to the staffing agreement between the VBSO and the VBPD. *See* ECF No. 38 ¶ 15; ECF No. 47 ¶ 1.

This "off premises" arrest does not impact the Court's *Elrod-Branti* analysis. The deputies in *Bland* also performed similar extra work outside of their normal duties, during which they were "in uniform and armed," and the court found that "[i]t is hard to see how this fact could significantly impact our *Elrod-Branti* analysis." *Bland*, 730 F.3d at 379 (quotation marks omitted). The court noted that "the Sheriff did not make any showing that such apparently optional work outside of the Sheriff's Office was part of the 'specific duties of the public employees' position." *Id.* (quoting *Knight*, 214 F.3d at 549) (cleaned up). The same is true here. The parties agree that the plaintiff "requested to work extra duty pursuant to the [agreement.]" ECF No. 38 ¶ 17; ECF No. 47 ¶ 1. Thus, this was "optional work" that was not required as part of the plaintiff's duties as an Intake/Release Sergeant, which is an inference that the

Court must draw on summary judgment. Thus, this arrest is not relevant to the Court's *Elrod-Branti* analysis.[21]

This "off premises" arrest is irrelevant for an additional reason. The plaintiff was promoted to Sergeant in January of 2015 and was assigned to Intake/Release in February 2016. Part I ¶ 5. The Fourth Circuit has instructed courts to "examine the job duties of the position" to determine whether the *Elrod-Branti* exception applies. *Jenkins*, 119 F.3d at 1165. The "position" in this case is that of a Sergeant in the Intake/Release unit from February 2016 until the plaintiff's last appointment expired. But this off-premises arrest—and nearly half of the "Arrest Reports" provided by the defendant that list the plaintiff as the arresting officer—date from before 2016. *See* ECF No. 38-7 (arrests in 2010, 2011, 2012, 2013). The defendant has not shown that these pre-promotion/pre-reassignment activities are probative of the nature of plaintiff's role as an Intake/Release Sergeant. This is an additional reason that the Court must find that this arrest does not impact its *Elrod-Branti* analysis.

When the plaintiff's off-premises arrest is set aside, the Court cannot say that the plaintiff was "out in the county engaging in law enforcement activities on behalf of the sheriff," *Knight*, 214 F.3d at 550, nor can the Court say that the plaintiff was a

---

[21] At the Final Pretrial Conference in this matter, the Court excluded the MOU between the VBPD and VBSO and ordered redacted the records of any arrests the plaintiff made before he was promoted to Sergeant and transferred to Intake/Release. *See* ECF No. 92 (Defendant's Exhibits 21 and 23). As the Court explained from the bench, activities undertaken outside the context of an individual's actual job responsibilities are irrelevant to the *Elrod-Branti* analysis.

criminal investigator,[22] *McCaffrey*, 921 F.3d at 167. Thus, on this record, the plaintiff's off-premises arrest does not differentiate this case from *Bland* and *Knight*.

On a more fundamental level, the parties dispute the extent of the plaintiff's arrest powers. The parties agree that the plaintiff attended the Virginia Department of Criminal Justice Services ("DCJS") Basic Jailor Academy. ECF No. 38 at 3; ECF No. 47 at 2. And the plaintiff's affidavit states that he does not have "the full law enforcement certification from the DCJS," which the defendant does not appear to dispute. ECF No. 47-1 ¶ 34; ECF No. 47-4 at 115:2–8 (defendant agreeing that the "deputies and . . . sergeants who work in the jail" don't "receive the same training and certification under DCJS as police department employees"). But the defendant testified in his deposition that "[the plaintiff] has the authority to make *any* arrests

---

[22] One additional factor that may weigh in favor of the plaintiff is the nature of the VBSO's overall law enforcement responsibilities. Virginia is divided into counties and independent cities. Sheriffs are the primary law enforcement officers in counties. But, in independent cities, police departments are usually the primary law enforcement entities and sheriffs' offices take a secondary role, often focusing on correctional facilities and courts. This dynamic likely played into the Fourth Circuit's decisions in *Bland* and *McCaffrey*, both of which dealt with Virginia sheriffs. In *Bland*, the sheriff's office at issue was the Hampton Sheriff's Office. *Bland*, 730 F.3d at 371. As the court noted, "[t]he Hampton City Police Department has primary responsibility for law enforcement in Hampton" and "the Sheriff's Office maintains all city correctional facilities, secures the city's courts, and services civil and criminal warrants." *Id.* The *Bland* court concluded that the *Elrod-Branti* exception did not apply to the deputies in that case. By contrast, in *McCaffrey*, the sheriff's office involved was a county sheriff's office. *McCaffrey*, 921 F.3d 159 at 161. As a result, the plaintiff deputy in that case engaged in traditional law enforcement functions. *Id.* (noting that the plaintiff was a "major crimes detective."). In this case, Virginia Beach is an independent city that has its own police department. As a result, the plaintiff argues, the VBSO is not the primary law enforcement agency in Virginia Beach. *See* ECF No. 47 ¶ 5; ECF No. 47-1 ¶ 34. These facts, if ultimately proven true, could make this case more like *Bland* than *McCaffrey*.

in Virginia . . . *He was a law enforcement officer*." ECF No. 47-4 at 114:3–7 (emphasis added).

Thus, a factual dispute exists regarding the extent of the plaintiff's arrest powers and the way he exercised them. If the plaintiff indeed had "the authority to make any arrests in Virginia," ECF No. 47-4 at 114:3–7, and he exercised that authority, then this case could be more like *McCaffrey*. But if it is ultimately shown that the plaintiff's arrest powers were circumscribed, or that they did not form an "appreciable part of [his] duties," then this case could be more like *Bland*. 730 F.3d at 379 (noting that the deputies did not have the "basic law enforcement" credential, which meant that they could not "exercise the statutorily granted general arrest power."). These disputed facts preclude summary judgment.

> c.   *The plaintiff's communication responsibilities do not, on this record, make him a "communicator."*

The defendant argues that the plaintiff's interactions with third parties warrant finding that the *Elrod-Branti* exception applies. ECF No. 38 at 25. *Jenkins* instructs that "[i]f the [plaintiff's] position resembles . . . a communicator . . . then [political] loyalty to the sheriff is an appropriate requirement for the job." 119 F.3d at 1164. This presumably originates from *Branti*, where the Court explained that "it is equally clear that the Governor of a State may appropriately believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments." 445 U.S. at 518.

It is undisputed that the plaintiff interacted with outside entities including "other law enforcement agencies, arresting officers, magistrates, [and] medical staff." Part I ¶ 6. The parties dispute the extent to which the plaintiff interacted with members of the public. *Id.* n.3. Most significantly, the record before the Court does not explain the content of the plaintiff's communications with these third parties. Therefore, the defendant has failed to show that the plaintiff was a "communicator" who was, *e.g.*, "involved in communicating the sheriff's policies or positions to the public." *Knight*, 214 F.3d at 550–51 ("'Communicators'" who lack *Elrod/Branti* protection are those who perform duties such as speechwriting for a public official or explaining his views to the press.") (quoting *Branti*, 445 U.S. at 518).

*       *       *

In short, the defendant has failed to show that he is entitled to summary judgment on the question of whether the *Elrod-Branti* exception applies. Several material facts are disputed, and the undisputed facts tend to favor the plaintiff.

## C.   Qualified Immunity

Qualified immunity will bar the plaintiff's claims for monetary damages if, at the time the plaintiff was terminated,[23] "a reasonable sheriff could have believed he had the right to choose not to reappoint" the plaintiff for his political speech or association. *Bland*, 730 F.3d at 391. The defendant has failed to show, at this point, that he is entitled to qualified immunity on the plaintiff's claims. The defendant

---

[23] Qualified immunity does not bar claims for injunctive relief. *Pearson v. Callahan*, 555 U.S. 223, 242 (2009).

argues that qualified immunity applies because a sheriff "in Sheriff Stolle's position in late 2021 could have reasonably concluded that plaintiff more closely aligned with a law enforcement deputy than with a custodial deputy, thus supporting his decision not to reappoint plaintiff."[24] ECF No. 38 at 29. The Court is not so sure.

As an initial matter, the Fourth Circuit issued a clear warning to sheriffs in *Jenkins*: "[w]e limit dismissals based on today's holding to those deputies actually sworn to engage in law enforcement activities on behalf of the sheriff. *We issue this limitation to caution sheriffs that courts examine the job duties of the position*, and not merely the title, of those dismissed." 119 F.3d at 1165 (emphasis added). Every Fourth Circuit case that has considered this question in the context of deputy sheriffs since *Jenkins* has emphasized this warning. *McCaffrey*, 921 F.3d at 166; *Bland*, 730 F.3d at 377; *Knight*, 214 F.3d at 549. Thus, a reasonable sheriff would have known to examine the job duties of any deputy before deciding whether to reappoint them based on their speech or association.

*Bland* and *Knight* have established a zone in which firing a deputy sheriff for political reasons was clearly established as unconstitutional: where the deputy sheriff's job duties resemble those of a jailer. On this record, there are disputes of

---

[24] As the *Bland* court notes, if the *Elrod-Branti* exception applies such that if "an employer . . . does not violate his employee's association rights . . . the employer also does not violate his employee's free speech rights by terminated him for *speech* displaying that political disloyalty." *Bland*, 730 F.3d at 394 (emphasis in original). Thus, it appears that if the *Elrod-Branti* exception applies, either directly or via qualified immunity, it could bar the plaintiff's speech claim as well as his association claim.

material fact exist regarding the duties of the plaintiff's former position.[25] *See* Part III.B.ii. If these factual disputes are resolved in favor of the plaintiff, the record may show that the plaintiff's asserted rights were "clearly established" "at the appropriate level of specificity." *Wilson v. Layne*, 141 F.3d 111, 115 (4th Cir. 1998) (*en banc*), *aff'd*, 526 U.S. 603, (1999). Thus, these factual disputes preclude summary judgment on the issue of qualified immunity.

There are two notable (but disputed) differences between the plaintiff and the deputies in *Bland*: the plaintiff was a supervisor, and the plaintiff actually exercised his arrest power. But as the Court stated above in Part III.B.ii., the Fourth Circuit has explained that "a supervisory employee does not automatically hold a position that is subject to the *Elrod–Branti* exception," *Lawson*, 828 F.3d at 249, and the extent of the plaintiff's supervisory responsibilities are in dispute. If, for example, the plaintiff was merely a low-level supervisor without "broad policy setting power," *id.*, it is hard to see how this fact would meaningfully distinguish this case from *Bland*.

In addition, the plaintiff's exercise of his arrest power, while disputed in various ways by the parties, might have been limited to serving warrants on inmates

---

[25] Furthermore, when the Court looks to the *undisputed* facts, those facts tend to show that the plaintiff's role resembles that of a jailer. The plaintiff's undisputed job responsibilities are similar to the custodial deputies in *Bland*. *Id.* at 377. Like the jailer in *Knight*, he "was not out in the county engaging in law enforcement activities on behalf of the sheriff," nor was he "a confidant of the sheriff" or "advis[ing] him on policy matters." 214 F.3d at 550. He was not "a lead investigator of high-profile crimes," *McCaffrey*, 921 F.3d at 167, nor was he an investigator of any kind. These facts further support the Court's determination to deny summary judgment on the issue of qualified immunity.

at the jail where the plaintiff was assigned to work, meaning that the plaintiff was not "out in the county engaging in law enforcement activities on behalf of the sheriff." *Knight*, 214 F.3d at 550. The Court cannot evaluate the impact of these differences on the issue of qualified immunity until the factual disputes underlying them are resolved.

In short, the defendant has failed to show that he is entitled to qualified immunity at this stage of the litigation. Until the factual disputes regarding the plaintiff's former role, responsibilities, and powers are resolved, the Court cannot determine whether the defendant is entitled to qualified immunity.

### D. Eleventh Amendment

The defendant asserts that the plaintiff's claim against the defendant "in his official capacity is considered a suit against the state and is barred by the Eleventh Amendment." ECF No. 38 at 29. The plaintiff asserts that the parties "appear to agree on the application of the Eleventh Amendment to these facts" because the plaintiff seeks injunctive relief (reinstatement) against the defendant in his official capacity and monetary relief against the defendant in his personal capacity. ECF No. 47 at 30. The defendant did not address the plaintiff's arguments in reply. *See* ECF No. 49. The Court agrees with the plaintiff that he may seek injunctive relief in the form of reinstatement from the defendant in his official capacity, *see Coakley v. Welch*, 877 F.2d 304, 307 (4th Cir. 1989), and monetary relief from the defendant in his individual capacity, *Hafer v. Melo*, 502 U.S. 21, 30 (1991). Accordingly, the defendant's motion is denied on these grounds.

IV.    **CONCLUSION**

For the foregoing reasons, the defendant's Motion for Summary Judgment (ECF Nos. 37) is **DENIED.**

The Clerk is **DIRECTED** to forward a copy of this Order to all counsel of record.

**IT IS SO ORDERED.**

_____ /s/

Jamar K. Walker
United States District Judge

Norfolk, Virginia
October 2, 2023

44